## BETTER PACKAGES, Inc., v. L. LINK & CO., Inc., et al.

District Court, S. D. New York.
Sept. 15, 1932.

Hammond & Littell, of New York City (Nelson Littell, of New York City, of counsel), for plaintiff.

Marshall & Hawley, of New York City (E. W. Marshall, of New York City, of counsel), for defendants.

FRANK J. COLEMAN, District Judge.

The principal question is whether the three patents in suit are valid. They were all issued on the applications of Kreuger, and, for the sake of convenience, No. 1,194,-752 will be designated as patent No. 1; reissue 18,322 as patent No. 2; and No. 1,782,-123 as patent No. 3. Patent No. 1 relates to a device for moistening the gummed surface of labels or paper stickers. The other two relate to machines for serving and moistening sections of gummed paper strips such as are used in sealing packages and cardboard cartons. The infringing articles are machines of the latter class, for serving and moistening gummed strips; and they are made and sold by the defendant L. Link & Co., Inc., of which defendant Louis Link is president and defendant Albers a salesman.

Such machines had been in commercial use long before Kreuger's applications and they ordinarily consisted of a receptacle to hold the roll of gummed paper; a feeding means to pull the strip from the roll and to push it forward where it passed between the cutting blades and through a moistening device; and, finally, a means for actuating the feeding and cutting devices so that a section of strip already moistened and severed was made available for pasting on the package or carton. Kreuger entered a crowded art and the claims relied on relate only to details of the structure. The specified claims in patents No. 1 and No. 2 relate to the moistening device, and the specified claims in patent No. 3 relate to the feeding means.

Considering first the moistening device, the prior art had used an inverted camel's hair brush with its base placed in a receptacle of water so that by force of capillary attraction the water was carried to near the top of the brush. It was also well known that if a plate was kept in contact with the top of the brush, the capillary attraction would support the water not only up to the top of the brush but in a film between it and the plate. Moisteners were in common use which possessed those two elements and permitted the gummed paper to be passed between them. It was recognized that if the contact between the brush and the plate was permitted to remain broken, the water would recede and the top of the brush would become dry until again used sufficiently to bring up the water. For commercial purposes, moreover, it was necessary to keep the top of the brush always wet so that no gummed paper would be passed over it without being moistened. Frequent use of the device caused the hair of the brush to retain a bent position, and if the contact plate was stationary, there resulted a permanent hiatus between it and the top of the brush with consequent drying of the latter.

There was thus presented to the prior art the problem of eliminating the hiatus caused by frequent use of the moistening device. This was accomplished in some instances by a manual readjustment of the plate or of the brush so as to bring them into contact again. Kreuger was the first to solve the problem of having the plate supported by the top of the brush against gravity, so that as the brush assumed a bent position from frequent use, there would be an automatic, instead of a manual, readjustment of the plate and a continuance of the contact relation. This ob-

viated loss due to operators negligently omitting to make a necessary manual readjustment or to their making it inexpertly so that a proper pressure was not maintained between the plate and the brush. Under Kreuger's plan the pressure remained constant and equaled the weight of the plate.

This idea he covered in patent No. 1, which had no particular application to a strip-serving machine, but to a device for holding and moistening individual labels or paper stickers. The claims relied on, however, relate only to the moistening element, and, if otherwise valid, are adequate to include such an element even in a strip-serving machine.

The nearest approach to the idea in the prior art is to be found in the British patent, No. 19,812, issued to Pitney in 1906, and in the letter-sealing machines constructed in accordance with it. There the moistening element had a hinged contact plate which was supported horizontally against gravity by lugs underneath it. The brush was so placed that its hairs were in close contact with the plate even after they had become bent from frequent use, but eventually a hiatus was created and the brush had to be manually readjusted to eliminate it. In a sense the plate rested by gravity on the brush, in that gravity, reinforced in some instances by a spring, kept the plate horizontal where it was ordinarily in contact with the brush, and in so far as there was any pressure between the two, there was a "resting" on the brush because the plate remained motionless. But the essential difference between Kreuger and Pitney was that the former made the brush *support* the plate with the consequent automatic readjustment of the plate to any position which the brush might assume, which feature was entirely lacking from Pitney's idea. Counsel for the plaintiff has misapprehended certain remarks of mine at the trial which were not intended to express any thought at variance with this finding.

Another reference which should be considered was Elliott, No. 868,977, issued in 1907, which covered a strip-serving machine in which a pivoted pressure-foot could be permitted to rest on the moistening material. Though Elliott had no idea of the pressure-foot acting as the contact plate for the purpose of maintaining the water at the top of the brush, it might conceivably serve that purpose. But he discloses no means by which it might readjust itself to a new position of the brush or wick. Indeed, he apparently assumed that the moistening material would be a wick rather than a brush and would consequently not be susceptible to as great change of position.

It remains to be determined whether Kreuger's contribution involved invention. The evidence discloses some trouble in the commercial use of moisteners, arising from lack of automatic adjustment, and the great success of plaintiff's products which embodied it. How much of that success was due to this feature it is difficult to say, and I have not found the history of the problem in this case very cogent. The proof is convincing, however, that Kreuger did contribute a new idea, and though not at all profound, it is fair, I believe, to conclude that it was not obvious to the ordinary skilled workman, and was, therefore, patentable.

■ Of the three claims cited in patent No. 1, two adequately embody the invention when considered in connection with the specification, and the third does not. On account of the large number of claims cited in the three patents, it is impractical to transcribe them in this memorandum and point out in detail their deficiencies. It must suffice to state that in patent No. 1, claims 14 and 15 are held valid and claim 12 invalid.

■ Patent No. 2 covers a modification of the above idea to suit the requirements of a strip-serving machine. In such machines where the strip is pushed through the moistening device it is necessary to have an opening between the plate and the brush in alignment with the path of the strip. Since the strip is not very stiff, if it is pushed forward so that its edge strikes the body of the brush or the edge of the plate, it will buckle and not pass between them. If the plate is supported entirely by the brush, it is bound to settle lower, as the brush assumes a more bent position with frequent use, and consequently the line of contact between them is bound to change with reference to the path of the gummed strip. It was necessary, therefore, to adopt some arrangement whereby the edge of the plate which was nearest to the approaching strip would be permanently supported above the path so that the strip might easily pass beneath it. In order to retain the feature of self-adjustability so that the plate might automatically remain in contact with the brush even after the latter lowered its position from frequent use, Kreuger provided that the other edge of the plate be unsupported except by the brush, with the result that with every change of the latter's position the plate by force of gravity was kept in contact with it.

This, of course, presupposed that the permanent support of the one edge of the plate be a pivot or rotatable joint so as to permit the movement of the other edge.

While the arrangement was only a slight modification of the original idea, it was not, I believe, one which would have been obvious to a skilled worker, and therefore involved a low grade of invention. None of the prior art cited impairs its validity. Pitney and Elliott came nearest to it, in that they employed a hinged plate and a pivoted presser foot, but they did not provide self-adjustability and, furthermore, did not make possible the pushing of the strip through the moistener when the latter was in its normal condition. The claims relied on are too numerous to permit of their transcription here, but they embody the above idea, and are accordingly held valid.

Defendants' strip-serving machines plainly infringe most, if not all, of the cited claims in patent No. 2 because they employ identically the same kind of moistener. There may be more doubt as to whether they also infringe patent No. 1, in which the contact plate is supported solely by the brush without any pivoted means to support one edge; but no point of that is made in the defendants' briefs, and I believe there was infringement of the cited claims in that patent also.

Patent No. 3 covers a strip-serving machine, and the claims relied on relate to the feeding device which consists primarily of a wheel with a serrated edge pressed against the surface of the strip. As the wheel is rotated on its axis, the serrated edge pulls the strip from the roll and pushes it forward toward the cutting and moistening means. The prior art had such feeding devices, and Kreuger claims no novelty except in so far as he specified that the serrated disc be "comparatively thin and light." The purpose of the thinness of the disc was to accomplish a centering of the strip upon its path so that it might be pushed straight through the cutting and moistening devices without having the edges of the strip crushed against side guards. Unfortunately for the plaintiff the tests conducted in court convinced me that comparative thinness of the disc had no effect on the centering of the strip. Two machines were operated, one with a comparatively wide disc and the other with a comparatively thin one, and both centered the strip upon its path to the same extent. It must be found, therefore, that the comparative thinness of the disc serves no such purpose as claimed for it and was therefore not patentable.

The purpose of making the disc comparatively light was to reduce the momentum of the machine so that there would not be any overfeeding of the strip beyond the desired length. Even assuming that the momentum of the feeding device was controlled by the weight of the disc to the exclusion of other moving parts, it does not seem to me an act of invention to reduce the momentum by reducing the weight. Surely an ordinary skilled mechanic would think of that solution.

Since counsel for the plaintiff predicates the validity of the claims cited in patent No. 3 solely on the comparative thinness and lightness of the feeding disc, they must, in view of the above conclusions, be held invalid.

As to the liability of the various defendants, the record would not sustain a decree against Albers, who was merely a salesman; but Louis Link had such connection with the entire matter that he should be bound by the decree, as also his corporation.

Settle decree on notice.