### RAILWAY ENGINEERING EQUIPMENT CO. v. OREGON SHORT LINE R. CO.

#### No. 12818.

District Court, D. Utah, Central Division.

July 5, 1934.

Parkinson & Lane and Wilkinson, Huxley, Byron & Knight, all of Chicago, Ill., and Beverly S. Clendenin, of Salt Lake City, Utah, for plaintiff.

L. B. Mann, of Chicago, Ill., and George H. Smith, Robert B. Porter and W. Hal Farr, all of Salt Lake City, Utah, for defendant.

JOHNSON, District Judge.

This suit arises out of alleged infringements of two patents assigned by the patentees to plaintiff. The patents involved are Otis patent, No. 1,592,618, dated July 13, 1926, and Plant patent, No. 1,686,103, dated October 2, 1928. The defendant de-

nics the alleged infringements and challenges the validity of the patents on various grounds.

The National Boiler Washing Company, of which Otis was an officer, controlled Raymer patent, No. 788,376, dated April 25, 1905, and Gale patent, No. 831,337, dated September 18, 1906. These patents covered a method for supplying and using hot water in washing out and for refilling locomotive boilers preparatory to the return of locomotive engines to service. The method covered by these patents under licenses from the National Boiler Washing Company was quite generally adopted and used by railroads during the life of the patents. The defendant had installed and was using the system at the time of the alleged infringements complained of in this action at its terminal in the city of Pocatello, Idaho.

In his application for patent filed May 22, 1933, Otis assumed the existence and use of the boiler washing and refilling system above referred to, and made it the starting point of his direct steaming system for locomotives, as it is styled in the application. In the application he stated that:

"The present invention provides a method of recharging washed out boilers and bringing them to steaming pressure in a minimum of time consistent with boiler safety, without prohibitive expense for stationary boiler capacity, but with the use of existing filling-water storage-tanks of standard construction. * * *

"The invention consists in taking filling water from a non-steam-generating extraneous source (the ordinary filling tank) in which the water is kept at temperature which can be economically maintained with present standard equipment."

The patent as finally allowed contained four claims. The first, second, and third contemplate the appropriation of the flow of the hot filling water system in general use by railroads under license from the National Boiler Washing Company, and mixing the hot water in a mixing box with a flow of steam taken from a separate steam-producing source, and discharging the resulting stream of hot water into the locomotive boiler until the desired water level in the boiler is attained, when the flow of hot water is cut off and the flow of steam continued until working pressure in the boiler is developed. Under the fourth claim the mixing box is dispensed with. In

the complaint of the plaintiff only the fourth claim is alleged to have been infringed by the defendant. It reads as follows:

"The method of refilling empty locomotive boilers and developing steam pressure therein, which consists in taking water from a non-steam-generating water source, and introducing it into the boiler, then while continuing the supply of water, taking a body of steam from a separate source, and releasing it into mixing and heating relation to such water, until a desired water level is attained, the components of water and steam being of such temperatures and so proportioned that the contents of the boiler will have attained a steaming temperature on or before reaching said level, and then continuing the introduction of the steam without the water, until a working pressure is developed in the boiler."

In the year 1929 the defendant completed the installation of a number of new stationary boilers on its grounds at Pocatello, Idaho, with steaming connections leading to and into its locomotive roundhouse near by. About the beginning of 1930 the defendant began to inject steam from these stationary boilers into its locomotive boilers as and while they were being refilled with hot water, as practiced theretofore under its license from the National Boiler Washing Company. The method usually followed by the defendant was first to start a flow of hot water into the locomotive boiler through a plug on the side of the boiler; a little later to begin the injection of steam into the hot water already in the boiler through a plug on the opposite side of the boiler; to continue the simultaneous injection of hot water and of steam until the desired level of the water had been attained; then to shut off the flow of the hot water and thereafter to continue the injection of steam until working pressure in the boiler was developed. Usually the temperature of the hot water flowing into the boiler was about 180 degrees F. The steam injected into the boiler was usually about 250 degrees F., under a pressure of about 150 pounds.

Plaintiff claims that the practices of the defendant as above outlined constitute infringements of claim 4 of the Otis patent. Counsel for plaintiff in their brief say:

"Otis was not the first to put water in the boiler of a locomotive engine and heat it up either by fire in the firebox or by

steam to a point where it can be utilized for running the engine. He was not the first to introduce water into the boiler of a locomotive engine and bring this to proper working pressure by introducing steam into it. He was not the first to maintain a steam condition in a locomotive once it had been brought to that condition. These were all very old, but he for the first time provided a method whereby hot 'non-steam-generating water' was introduced into the empty boiler of a locomotive engine and steam pressure developed in the boiler by taking a body of steam from a separate source and releasing it into mixing and heating relation with the water until the desired water level is attained, and the component parts of the water and steam being of such temperatures and so proportioned that the contents of the boiler will have attained the steaming temperature on or before reaching the desired level, and then continuing the introduction of steam without water until a working pressure is developed in the boiler."

As I understand it, it is the contention of counsel that the Otis method as described in claim 4 of the patent, not to mention the others, constitutes a patentable combination. The method described in claim 4 differs in some respects from that outlined in claims 1, 2, and 3. Since the last named are not alleged to have been infringed, these differences need not be stated or considered, at least in any detail.

The steps to be taken under claim 4 in refilling empty locomotive boilers and developing working steam pressure therein consist: (1) In taking water from a non-steam-generating source and introducing it into the boiler; then, while continuing the supply of water, (2) in taking a body of steam from a separate source and mixing it with the water in the boiler; (3) in continuing these processes until the desired water level in the boiler has been attained; (4) in so proportioning the flow of water and steam into the boiler that the contents of the boiler will have attained a steaming temperature on or before reaching the desired water level; (5) in continuing the introduction of steam alone into the water in the boiler after the water level has been reached until working pressure has been developed.

While counsel in the statement from their brief above quoted concede that no one of the several steps above outlined is either new or novel, they do contend that in their combination a new, novel, and useful result was attained constituting invention and rendering claim 4 of the patent, the one in question here, valid and infringed by the practices of the defendant as above outlined.

An examination of the file wrapper discloses that the application when filed contained twelve claims, five of which (8–12) relate to the method of filling and steaming locomotive boilers. The method described in No. 11 is quite similar to that described in No. 4 above quoted. It read: "The method of filling and steaming locomotive boilers, which consists in charging water and steam simultaneously into the boiler until a predetermined level of hot water is attained and with the injected steam in proportion to the injected water which causes steam pressure over the water at the time the water level is reached, and then continuing the injection of steam alone to raise the pressure in the steam space to the desired degree."

Under date of April 14, 1923, all the claims were rejected by the examiner. He noted that: "Claims 8 to 12 are rejected on Titcomb in view of Lamm."

Under date of October 29, 1923, Otis filed amendments to his application and four new claims in lieu of those disallowed by the examiner. These four claims, after amendment, were finally allowed. Claim No. 4 before amendment read: "The method of refilling empty locomotive boilers and developing steam pressure therein, which consists in taking from an extraneous water source, water that is hot but at a temperature materially below boiling, introducing a body of such water at such temperature into the boiler, then while continuing the supply of water at such temperature, taking a body of steam from a separate source and releasing it into impelling and heating relation to such water, discharging the resultant stream of water into the boiler until a desired level is attained, and then continuing the introduction of the steam without the water, until a working pressure is developed in the boiler."

It will be observed that this claim as filed provided for "discharging the resultant stream of water into the boiler until a desired level is attained." This method, found also in the other three claims as finally allowed, contemplated the use of a mixing box. As already observed, under

claim 4 as finally allowed the mixing box is dispensed with, and the saving in time resulting from its use is lost.

Under date of June 24, 1924, the examiner wrote:

"In response to amendment filed November 9, 1923, Claims 1 to 4, inclusive, are rejected on Lamm, of record, in view of Litchfield, 264,466, and Litchfield, 262,958, of record.

"Lamm shows the first and third steps of the applicant's procedure. There does not appear to be invention in the applicant's intermediate step in view of the Litchfield patent."

On June 19, 1925, Otis amended each of his claims in certain particulars and claim 4 so as to read: "The method of refilling empty locomotive boilers and developing steam pressure therein which consists in taking water from an extraneous water source and introducing it into the boiler, then while continuing the supply of water, taking a body of steam from a separate source and releasing it into mixing and heating relation to such water, until a desired water level is attained, the components of water and steam being of such temperatures and so proportioned that the contents of the boiler will have attained a steaming temperature on or before reaching said level, and then continuing the introduction of the steam without the water, until a working pressure is developed in the boiler."

On November 2, 1925, the examiner wrote: "Claim 4 is not regarded as patentable over what applicant in his amendment A introduced in lieu of the cancelled text beginning in line 14, page 2, and extending through line 20, page 3, concedes to be old. For aught this claim states, the water which is introduced into the boiler may be of boiling temperature. It is, therefore, immaterial whether the water and the steam issue from separate sources or from the same source. In conjunction with this claim see the patent to Gale, 831,337, Sept. 18, 1906, 122–396, page 4, lines 44 to 51."

In this notification the examiner also disallowed claim 1 but allowed claims 2 and 3 as amended.

Under date of November 27, 1925, Otis amended his claims, including 4; but striking out the words "extraneous water source" and inserting in lieu thereof "non-steam-generating."

In connection with these last amendments he made the following remarks respecting claim 4:

"Claim 4 has been amended to bring in the patentable distinction of amendment A', and at the same time to clearly distinguish over the Gale Patent No. 831,387, one of the patents under which applicant's assignee has long operated, but which in no manner suggested the idea of rendering a locomotive self propelling as an incident to the boiler washing practice, although having, as other boiler washing systems do have, means for tempering water on its way to the locomotive.

"Applicant's invention involves the conception and perfection of a rational system whereby a cooled boiler can be filled and brought to steaming pressure safely and without boiler strains, in a minimum time and with minimum expenditure of heat, to say nothing of the elimination of the very objectionable effects of starting a fire under a cold boiler within the roundhouse, the expense of smoke disposal equipment and the difficulty of maintaining sanitary working conditions while firing is going on."

The reference to the Gale patent, in these remarks brings us to the consideration of the crucial question in issue. Time forbids any detailed review of the state of the art at the time Otis filed his application on May 22, 1922. In my opinion, however, not only were the Otis claims anticipated by Gale referred to by the examiner, but also by Raymer patent, No. 788,376, under which patent Otis had also long operated as an assignee.

Miller in his patent No. 1,357,717, application filed May 7, 1917, also disclosed: "When the washing out operation has been completed the hose is fixedly connected to the boiler and the water is turned on to refill the boiler. When the refilling operation is begun the live steam is also turned on which, as it mixes with the water, materially raises its temperature so that when the boiler is filled steam may be quickly gotten up."

Fireless steam locomotives have been in common use for many years in both the United States and England. Water and steam have been injected into such locomotives in various ways and always from separate sources. Although it does not appear that their simultaneous injection has ever

been in common use or emphasized prior to the Otis application, it does seem to me to be such an obvious method that might be employed, provided means for so doing were available, that co-ordinating such means was not invention, but merely an adaptation of available mechanical appliances to an obvious though a new use. The installation by numerous railroads of these appliances, stressed in the argument found in the file wrapper as ground for allowance of the patent, is, I think, evidence rather of successful salesmanship than of invention.

In my opinion, claim 4 is invalid for lack of invention, in view of the state of the art at the time of the filing of the application, and I so hold.

The Plant patent is built upon the Otis patent as a foundation. If this substructure is invalid for lack of invention in view of the state of the art at the time the application was filed, it seems to me too obvious to require review of the state of the art that the Plant patent must be held invalid on the same grounds in respect of each of the claims alleged to have been infringed by the defendant, and I so hold.